UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

SILVERWING MEDICAL LLC,

Plaintiff,

v.

ADORAMA INC. and KITCHEN WINNERS NY INC.,

Defendants.

---

**MEMORANDUM AND ORDER**

21-CV-4082 (LDH) (JAM)

---

LASHANN DEARCY HALL, United States District Judge:

Silverwing Medical LLC ("Silverwing" or "Plaintiff") brings the instant action asserting claims against Adorama, Inc. ("Adorama") and Kitchen Winners NY, Inc. ("Kitchen Winners") (together, "Defendants") for fraud, breach of contract, and unjust enrichment. Defendants assert a counterclaim against Plaintiff for breach of contract. Plaintiff moves, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for summary judgment on its breach of contract and fraud claims. Defendants move, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for summary judgment on Plaintiff's breach of contract, unjust enrichment, and fraud claims, as well as summary judgment on its counterclaim for breach of contract.

**UNDISPUTED FACTS[1]**

In February 2021, Plaintiff and Defendants entered into a Sales and Purchase Agreement (the "SPA"), pursuant to which Defendants agreed to sell Plaintiff one million boxes of nitrile gloves at a total purchase price of $10.5 million. (Defs.' Resp. 56.1 Statement ¶ 1, ECF No. 52-

---

[1] The following facts are undisputed unless otherwise noted. Further, facts that were not contradicted by citations to admissible evidence are deemed admitted. *See Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted.").

1; Decl. of Elliot Hahn ("Hahn Decl."), Ex. 1, Sales and Purchase Agreement ("SPA") § 1, ECF No. 50-6.) Specifically, the SPA provides for the sale of one million 100-count boxes of "LevMed" brand blue nitrile gloves that are "[m]edical exam grade with FDA 510k [certification],"[2] in an assortment of sizes, at a unit price of $10.50 per box. (SPA § 1.) Prior to the execution of the SPA, Defendants sent Plaintiff product samples. (Defs.' Resp. 56.1 Statement ¶ 5.) The parties dispute whether the product samples that were sent to Plaintiff were accompanied by documentation indicating that the company manufacturing the product, and the holder of the FDA 510(k) certification, was called Zhangjiang Jiali Glove Products Co., Ltd. (*Id.*; *see also* Hahn Decl., Ex. 4 ("Jiali Glove Prod. Spec."), ECF No. 50-9.) At the time the SPA was executed, Plaintiff paid Defendants a $1.05 million deposit. (Defs.' Resp. 56.1 Statement ¶ 6, SPA § 2(a).) The remaining 90% of the purchase price "for each shipment of goods" was to be paid to Defendants within 48 hours of delivery of a trackable bill of lading for the shipment to Plaintiff. (SPA § 2(c).) The SPA includes a "manufacturing disclaimer," stating that Defendants are merely resellers and that they make no warranties about the products "except that they conform to the specifications provided." (*Id.* § 5.) The agreement further provides that, "[i]n the event that upon arrival of the [p]roducts to the destination port, [Plaintiff]'s inspection reveals that the [p]roducts are not in conformance with the SGS report provided by [Defendants], [Plaintiff] shall be entitled to the full refund of the purchase price paid for the [p]roducts delivered." (*Id.* § 7.)

---

[2] The Food and Drug Administration ("FDA") requires companies manufacturing and importing medical devices for commercial distribution to register and submit listing information for those devices with the FDA. *See generally* 21 C.F.R. § 807. Companies that are required to register under this provision must also submit a "premarket notification submission" to the FDA, which includes, among other things, a "510(k) summary" or "510(k) statement" providing the basis for a determination by the FDA that the product is "substantially equivalent" to an already-approved device in commercial distribution. *Id.* §§ 807.81, .92, .93. Upon review of the 510(k) submissions, the FDA issues a determination of substantial equivalence. *Id.* § 807.92. The gloves purchased by Plaintiff were to have the requisite 510(k) certification from the FDA. (*See* SPA § 1.)

On March 24, 2021, upon receipt of bills of lading, (*see* Defs.' Resp. 56.1 ¶ 11), Plaintiff sent an additional $265,545 to Defendants, (*see id.* ¶ 9). Instead of providing Plaintiff with an "SGS report," however, Defendants provided Plaintiff with a pre-shipment inspection report from V-Trust Inspection Service, dated March 25, 2021 (the "V-Trust Report"). (*Id*. ¶¶ 10-11; Hahn Decl., Ex. 6 ("V-Trust Report"), ECF No. 50-11.) The V-Trust Report did not identify the factory where the gloves were made, and listed both the "client" and "supplier" of the product as "Kitchen Winners Inc." (Defs.' Resp. 56.1 Statement ¶¶ 14-15; V-Trust Report at 1.) The report also stated that it was in a "Custom-made report format for GTS Limited for [m]edical gloves," (V-Trust Report at 16), and contained pictures of gloves that listed the name Qingdao Zhongyang Medical Equipment Co., Ltd. ("Qingdao"), (*id.*; Defs.' Resp. 56.1 Statement ¶ 17). The report listed an order quantity of fifteen million gloves. (Defs.' Resp. 56.1 Statement ¶ 16; V-Trust Report at 7.) The parties dispute whether the V-Trust Report was altered from the version of the report that V-Trust Inspection Service maintained in its files. (Defs.' Resp. 56.1 Statement ¶ 33.)

Plaintiff expressed concerns about the identity of the manufacturer of the gloves and the manufacturer's FDA 510(k) certification. (*See* Defs.' Resp. 56.1 Statement ¶ 22.) On March 30, 2021, to address Plaintiff's concerns, Defendants sent Plaintiff a copy of an FDA 510(k) certification letter from a company named Zhonghong Pulin Medical Products Co., LLC ("Pulin"), dated March 9, 2016. (Defs.' Resp. 56.1 Statement ¶¶ 22-23.) The parties do not dispute that Pulin has a valid 510(k) certification in connection with the manufacturing of medical gloves. (Pl.'s Resp. 56.1 Statement ¶ 20, ECF No. 58-1.) The parties dispute whether, on March 30, 2021, Defendants sent Plaintiff a letter written on the letterhead of a company called "ZhongHong Pulon Medical Products Co., Ltd.," rather than Pulin, stating: "This letter is

3

to confirm [w]e [m]anufacture the Levmed Brand under our secondary factory named: Qingdao Zhongyang Medical Equipment Co., LTD Which is being manufactured all under our 510K # K152712 [sic]." (Defs.' Resp. 56.1 Statement ¶ 25.) Defendants made representations to Plaintiff that the gloves Plaintiff received from Qingdao were manufactured by Pulin. (*See* Defs.' Resp. 56.1 Statement ¶ 25; Pl.'s Resp. 56.1 Statement ¶ 11, ECF No. 54-1.) The parties dispute whether Qingdao has any affiliation with Pulin, and whether Pulin manufactures any Levmed products. (Defs.' Reply 56.1 Statement ¶¶ 24-25, ECF No. 60-1.)

Plaintiff made additional payments to Defendants of $400,000 and $450,000 between April 8, 2021 and April 9, 2021. (*See* Defs.' Resp. 56.1 Statement ¶ 32; Hanh Decl., Ex. 5 at 4, ECF No. 50-10.) In April 2021, a broker acting on behalf of Plaintiff, Eli Marciano ("Mr. Marciano"), went to a California warehouse that purportedly held a portion of the product delivered by Defendants pursuant to the SPA. (Def.'s Resp. 56.1 Statement ¶ 34.) The parties dispute whether Mr. Marciano reported to Plaintiff that the gloves were of inferior quality in comparison to the samples Plaintiff was previously shown. (*Id*. ¶ 35; Decl. of Eliezer Neger ("E. Neger Decl."), Ex. 2 ("Neger Dep. Tr.") at 69, ECF No. 50-7.) The parties also dispute whether additional testing of the gloves at the California warehouse further indicated that the product was inferior to the samples Plaintiff received. (Defs.' Resp. 56.1 Statement ¶ 46.) At some point after Mr. Marciano's visit, Defendants sent Plaintiff an Underwriters Laboratory test report (the "UL Report"), dated January 7, 2021. (Defs.' Resp. 56.1 Statement ¶ 36; E. Neger Decl., Ex. 16 ("UL Report"), ECF No. 58-18.) The parties dispute whether Defendants, via the UL Report, purported to show that the gloves sent to Plaintiff were manufactured by Pulin and met the criteria for proper performance and safety. (Defs.' Resp. 56.1 Statement ¶ 36.) The applicant

listed on the UL Report was a company named HuiQiao International (Shanghai) Co., Ltd.  (*See* UL Report at 4.)

On April 25, 2021, Mr. Neger sent an email to Joseph Weiner ("Mr. Weiner") of Kitchen Winners setting forth Plaintiff's belief that it received false 510(k) documentation, that the V-Trust and UL Reports had been doctored, and that the quality of gloves delivered to Plaintiff were inferior to the quality of the samples Plaintiff previously received.  (Defs.' Resp. 56.1 Statement ¶ 42.)  At this point, Plaintiff ceased its efforts to continue with the transaction and demanded the return of the total of $2,165,545 that Plaintiff paid to Defendants.  (Defs.' Resp. 56.1 Statement ¶ 47.)  Thereafter, Defendants' attorney, Zaki Tamir, sent Plaintiff a letter dated May 24, 2021, containing a heading with the names "Zhonghong Pulin Medical Products Co., LTD" and "Qingdao Zhongyang Medical Equipment Co., LTD."  (Defs.' Reply 56.1 Statement ¶¶ 48-49.)  The parties dispute whether the May 24, 2021 letter was doctored.  (*Id*.)

## STANDARD OF REVIEW

Summary judgment must be granted when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The movants bear the initial burden of demonstrating the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Feingold v. New York*, 366 F.3d 138, 148 (2d Cir. 2004).

Where the non-movant bears the burden of proof at trial, the movant's initial burden at summary judgment can be met by pointing to a lack of evidence supporting the non-movant's claim.  *See Celotex Corp.*, 477 U.S. at 325.  "But where the moving party has the burden—the

plaintiff on a claim for relief or the defendant on an affirmative defense—his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986) (emphasis omitted) (quoting W. Schwarzer, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact*, 99 F.R.D. 465, 487–88 (1984)); *see also Leone v. Owsley*, 810 F.3d 1149, 1153–54 (10th Cir. 2015) (collecting cases).

Once the movant meets their initial burden, the non-moving party may defeat summary judgment only by adducing evidence of specific facts that raise a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 250; *Davis v. New York*, 316 F.3d 93, 100 (2d Cir. 2002). The Court is to believe the evidence of the non-movant and draw all justifiable inferences in their favor, *Anderson*, 477 U.S. at 255, but the non-movant must still do more than merely assert conclusions that are unsupported by arguments or facts. *Bellsouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996).

Finally, "[i]n considering motions for summary judgment, a court can consider only admissible evidence." *Glowczenski v. Taser Int'l, Inc.*, 928 F. Supp. 2d 564, 569 (E.D.N.Y. 2013), *aff'd in part, dismissed in part*, 594 F. App'x 723 (2d Cir. 2014) (citing *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997)). "The rules governing the admissibility of evidence on a summary judgment motion are the same as those governing admissibility at trial, and the district court has broad discretion in choosing whether to admit evidence." *Id.*

## DISCUSSION

## I.    BREACH OF CONTRACT CLAIMS

"Under New York law, a breach of contract claim requires proof of (1) an agreement, (2) adequate performance by the plaintiff, (3) breach by the defendant, and (4) damages." *Fischer &*

*Mandell, LLP v. Citibank, N.A.*, 632 F.3d 793, 799 (2d Cir. 2011).  "The primary objective of a court in interpreting a contract is to give effect to the intent of the parties as revealed by the language of their agreement."  *Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 157 (2d Cir. 2000).  The language of a contract is ambiguous if "a reasonably intelligent person viewing the contract objectively could interpret the language in more than one way."  *Topps Co. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 68 (2d Cir. 2008).  Generally, summary judgment is appropriate in a contract dispute only where the contract's terms are unambiguous, whereas "interpretation of ambiguous contract language is a question of fact to be resolved by the factfinder." *Compagnie Financiere*, 232 F.3d at 158.

### A. Plaintiff's Breach of Contract Claim

#### 1. Breach

Defendants argue that they are entitled to summary judgment dismissing Plaintiff's breach claim because the record establishes that Defendants adhered to their obligations in the contract.  (Defs.' Mem. L. Opp'n Pl's Mot. Summ. J. ("Defs.' Opp'n") at 19, ECF No. 52; Defs.' Mem. L. Supp. Mot. Summ. J. ("Defs.' Mem. L. Supp.") at 9, ECF No. 56-1.)  Specifically, Defendants argue that the V-Trust Report is equivalent to the SGS report and, therefore, they did not breach the SPA by providing a V-Trust report instead of an SGS report.  (Defs.' Mem. L. Supp. at 10-11.)  On the other hand, Plaintiff contends that there is no genuine dispute of material fact that Defendants failed to provide Plaintiff with authentic 510(k) certification documentation, as required by the SPA.  (Pl.'s Mem. L. Supp. Mot. Summ. J. ("Pl.'s Mem. L. Supp.") at 14, ECF No. 50-1; Pl.'s Mem. L. Opp. Defs.' Mot. Summ. J. ("Pl.'s Opp'n") at 3-13, ECF No. 58.)  Specifically, Plaintiff argues that Defendants' failure to provide it with an SGS

inspection report, as explicitly contemplated by the SPA, amounted to a breach of the agreement. (*See* Pl.'s Opp'n at 8-13.)  The Court agrees with Plaintiff.

When interpreting the terms of a contract, "words and phrases . . . should be given their plain meaning."  *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005) (alteration in original) (quoting *Shaw Group, Inc. v. Triple Int'l Corp.*, 322 F.3d 115, 121 (2d Cir. 2003).  Indeed, "[a] written agreement that is clear, complete and subject to only one reasonable interpretation must be enforced according to the plain meaning of the language chosen by the contracting parties."  *In re Coudert Bros.*, 487 B.R. 375, 389 (S.D.N.Y. 2013) (quoting *Acumen Re Mgmt. Corp. v. Gen. Sec. Nat'l Ins. Co.*, No. 09-CV-1796, 2012 WL 3890128, at *5 (S.D.N.Y. Sept. 7, 2012)).  Here, the plain terms of the SPA provide that, if Plaintiff's inspection of the gloves revealed that they were not "in conformance with the SGS report provided by [Defendants], [Plaintiff] shall be entitled to the full refund of the purchase price paid for the [p]roducts delivered."  (SPA § 7.)  The parties do not dispute the fact that Defendants provided Plaintiff with a V-Trust Report instead of the SGS report contemplated by the terms of the SPA.  (Defs.' Resp. 56.1 Statement ¶ 10; *see* Pl.'s Resp. 56.1 Statement ¶ 10.)

Nonetheless, Defendants argue that Plaintiff's claim for breach of contract must fail because the V-Trust Report "serves the exact same purpose" as an SGS report.  (Defs.' Mem. L. Supp. at 11; Defs.' Reply in Supp. Mot. Summ. J. ("Defs.' Reply") at 3-4, ECF No. 60.)  Even if true, that fact is of no consequence here.  That is, Defendants have provided the Court with no basis to ignore the plain and unambiguous terms of the SPA in favor of their self-serving assessment that the reports serve the same purpose.  Certainly, should Plaintiff have only sought 510(k) certification, they could have bargained for just that and left silent the issuer of the report. Instead, Plaintiff specified an SGS report.  Indeed, the SPA provides that, should the gloves not

conform with the SGS Report—that is, should Defendants have failed to provide an SGS report by which to assess the gloves' compliance—Plaintiff would be entitled to a full refund of the purchase price.  (*See* SPA § 7.)  And, of course, the SPA does not provide that the gloves may be certified with an SGS alternative.  (*See* SPA § 7.)  Presumably, this is so, because the parties wanted to avoid the very issue caused by Defendants' breach.  In any event, Defendants' contention that the V-Trust Report is an adequate replacement for the SGS report is of no consequence.

As such, there is no genuine dispute of fact as to whether Defendants breached the unambiguous terms of the SPA, and thus, Plaintiff's motion for summary judgment on its breach of contract claim is warranted.[3]

### 2. Damages

Plaintiff argues that it is entitled to actual damages in the amount that it had paid to Defendants under the SPA—$2,165,545.  (Pl.'s Mem. L. Supp. at 9, 21.)  On the contrary, Defendants argue that, because Pulin manufactured the gloves and the gloves are 510(k) certified, they did not breach the contract.  (*See* Defs.' Opp'n at 14-15; Defs.' Mem. L. Supp. at 10-11.)  Thus, Defendants contend they are not liable for actual damages.  (Defs.' Opp'n at 16-17.)

With respect to the money paid by Plaintiff, parties do not dispute that Plaintiff paid a total of $2,165,545 to Defendants.  (*See* Defs.' Resp. 56.1 Statement ¶ 47; Pl.'s Resp. 56.1 Statement ¶¶ 25-26, 28.)  Additionally, the plain language of the contract states that Plaintiff is entitled to a full refund if the quality of the gloves does not conform to the standards in the SGS

---

[3] For the very reasons the Court grants Plaintiff's motion for summary judgment on its breach of contract claim, the Court denies Defendants' motion for summary judgment on Plaintiff's breach of contract claim and Defendants' counterclaim for breach of contract.

report.  (*See* SPA § 7.)  Because no SGS Report was provided to Plaintiff and Plaintiff rejected the gloves, (*see* Pl.'s Resp. 56.1 Statement ¶ 10; Defs.' Resp. 56.1 Statement ¶¶ 10, 47; Neger Dep. Tr. at 84:9-13; Hahn Decl., Ex. 21, ECF No. 50-26),[4]  Plaintiff is entitled to a full refund amount of $2,165,545.

Plaintiff also argues that they are entitled to damages for lost profits.  (*See* Pl.'s Mem. L. Supp. at 18-19.)  Under New York law, to recoup loss of future profits:  (1) a party must "demonstrate[] with certainty that such damages have been caused by the breach"; (2) "the alleged loss must be capable of proof with reasonable certainty"; and (3) "there must be a showing that the particular damages were fairly within the contemplation of the parties to the contract at the time it was made."  *U.S. for Use & Benefit of Evergreen Pipeline Const. Co. v. Merritt Meridian Const. Corp.*, 95 F.3d 153, 161-62 (2d Cir. 1996); *see also Point 4 Data Corp. v. Tri-State Surgical Supply & Equip., Ltd.*, No. 11CV00726CBARLM, 2014 WL 12769275, at *7-9 (E.D.N.Y. Sept. 17, 2014).  Defendants argue that Plaintiff is not entitled to damages for loss of future profits because Plaintiff fails to satisfy any of the requisite elements.  (Defs.' Mem. L. Supp. at 19; Defs.' Opp'n at 17-20.)  The Court agrees with Defendants.

Here, Plaintiff argues that they were acting as a reseller and "anticipated selling the product at an approximate 36% mark-up at $14.25 per box of gloves (versus the $10.50 per box price paid by Plaintiff under the SPA)."  (Pl.'s Mem. L. Supp. at 18.)  As such, Plaintiff calculates lost profits in the total of $3,780,000 (i.e., a 36% profit margin).  (*Id.* at 18-19.)  That is, here, Plaintiff calculates their lost profits based on the assumption that they would sell all

---

[4] *See Rienzi & Sons, Inc. v. I Buonatavola Sini S.R.L.*, 746 F. Supp. 3d 69, 82 (E.D.N.Y. 2024) ("To effectively revoke acceptance, 'the buyer must unequivocally communicate his intent to seller.'" (quoting *Ask Techs., Inc. v. Cablescope, Inc.*, No. 1 Civ. 1838, 2003 WL 22400201, at *3 (S.D.N.Y. Oct. 20, 2003)); *cf. In re Indesco Int'l, Inc.*, 451 B.R. 274, 304 (Bankr. S.D.N.Y. 2011) ("[R]etaining the goods—rather than returning them or making them available for return to the seller—constitutes acceptance . . . . ").

gloves at $14.25/glove.  As support, Plaintiff points to a single purchase order for the sale of 160,000 gloves at a price of $14.25.  (E. Neger Decl., Ex. 1 at 4.)  However, as Defendants keenly point out, outside of a purported purchase order for 160,000 gloves, which was dated one month prior to the execution of the SPA and lists "Pro-Tech Capital, LLC" as the seller, Plaintiff had not entered any contracts with or received any deposits from potential customers for gloves after entering the SPA.  (Defs.' Mem. L. Supp. at 19; Defs.' Opp'n at 17-20; *See* E. Neger Dep. Tr. 84:20-23, 84:24-85:01-02; E. Neger Decl., Ex. 1, ECF No. 50-3.)  This, alone, however, is too speculative to calculate the alleged profits for one million 100-count boxes of gloves.  *See Schonfeld v. Hilliard*, 218 F.3d 164, 172 (2d Cir. 2000) ("Although lost profits need not be proven with 'mathematical precision,' they must be 'capable of measurement based upon known reliable factors without undue speculation.'" (quoting *Ashland Mgt. Inc. v. Janien,* 82 N.Y.2d 395, 403 (1993))); *Trademark Rsch. Corp. v. Maxwell Online, Inc.*, 995 F.2d 326, 333 (2d Cir. 1993) (finding lost profit calculation too speculative where the plaintiff relied on four months of sales of a new product to extrapolate seven years of lost profits).

Construing the evidence in the light most favorable to Plaintiff, this court concludes that Plaintiff has not met its burden in demonstrating that it could calculate lost profits without undue speculation.  Accordingly, this Court grants Defendants' motion for summary judgment as to lost profits.

## II.    FRAUD CLAIM

"Under New York law, the essential elements of a fraud claim include 'representation of a material existing fact, falsity, scienter, deception, and injury.'"  *Manning v. Utils. Mut. Ins. Co.*, 254 F.3d 387, 400 (2d Cir. 2001) (quoting *N.Y. Univ. v. Cont'l Ins. Co.*, 639 N.Y.S.2d 283, 289 (1995)); *see also Cortes v. 21st Century Fox Am., Inc.*, 751 F. App'x 69, 72 (2d Cir. 2018)

(stating the elements of a fraudulent misrepresentation claim); *Cargo Logistics Int'l, LLC v. Overseas Moving Specialists, Inc.*, 723 F. Supp. 3d 212, 226 (E.D.N.Y. 2024). Specifically, plaintiffs asserting a claim of fraudulent misrepresentation must show that: "(1) the defendant made a material[ly] false representation, (2) the defendant intended to defraud the plaintiffs thereby, (3) the plaintiffs reasonably relied upon the representation, and (4) the plaintiffs suffered damage as a result of their reliance." *J.A.0. Acquisition Corp. v. Stavitsky*, 18 A.D. 3d 389, 390 (2005).

Moreover, under New York law, a fraud claim arising from a breach of contract must be "sufficiently distinct from the breach of contract claim." *Maxim Grp. LLC v. Life Partners Holdings, Inc.*, 690 F. Supp. 2d 293 (S.D.N.Y. 2010) ("New York law also requires that a fraud claim, raised in a case that stems from breach of contract, be 'sufficiently distinct from the breach of contract claim.'" (quoting *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 20 (2d Cir.1996))); *see Alexsam, Inc. v. MasterCard Int'l Inc.*, No. 15CV2799ILGSMG, 2017 WL 9482100, at *6 (E.D.N.Y. Mar. 6, 2017), *report and recommendation adopted*, No. 15-CV-2799, 2017 WL 3534997 (E.D.N.Y. Aug. 17, 2017) ("It is well-established under New York law that a fraud claim, even where sufficiently pled, is not cognizable if it is based on the same facts that underlie a claim for breach of contract."); *Clement v. Farmington Cas. Co.*, No. 13-CV-1026 NSR, 2015 WL 6971565 (S.D.N.Y. Nov. 10, 2015) (collecting cases) ("Courts are clear that fraud claims are properly dismissed when they are duplicative of breach of contract claims."). To maintain a claim for fraud separate from that of a breach of contract claim, "a plaintiff must either: (i) demonstrate a legal duty separate from the duty to perform under the contract; . . . (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or (iii) seek special damages that are caused by the

misrepresentation and unrecoverable as contract damages." *Bridgestone/Firestone, Inc.*, 98 F.3d at 20 (internal citations omitted); *Did-it.com, LLC v. Halo Grp., Inc.*, 174 A.D.3d 682, 102 N.Y.S.3d 687, 688 (2019) (reversing the lower court's dismissal of fraud claim as duplicative where the plaintiff alleged that the defendant made "misrepresentations of present fact that were collateral to the [contract] and further allege[d] that these misrepresentations induced the plaintiff to enter into the [contract]"). Defendants maintain that, because Plaintiff fails to identify any duty outside of the SPA, demonstrate a misrepresentation that is collateral or extraneous to the SPA, or point to any special damages independent of those recoverable as contract damages to which they are entitled, Plaintiff's fraud claim is duplicative of its breach of contract claim. (Defs.' Opp'n, at 21; *see* Defs.' Mem. L. Supp. at 12-13; Defs.' Reply at 6). The Court agrees.

As an initial matter, Plaintiff does not allege that a separate duty existed outside of that established by the SPA. (Compl.) Nor does Plaintiff allege special damages that are unrecoverable as contract damages.[5] (Compl.) Plaintiff does, however, allege that, following

---

[5] Plaintiff alleges out-of-pocket damages totaling $2,165,545—comprised of the $1,050,000 paid onto Defendants at the execution of the SPA, per the terms of the agreement, and the $1,115,545 paid onto Defendants upon receipt of the trackable bills of landing, per the terms of the agreement—along with punitive damages in the sum of $5 million. (Compl. ¶¶ 13, 14, 39, 41.) That is, here, Plaintiff alleges out-of-pocket damages that stem directly from the terms of the contract and are, thus, recoverable as breach-of-contract damages. *See RMLS Metals, Inc. v. Int'l Bus. Machines Corp.*, 874 F. Supp. 74 (S.D.N.Y. 1995) ("Damages recoverable for breach of contract are . . . limited to 'those damages which were reasonably foreseen or contemplated by the parties during their negotiations or at the time the contract was executed.'" (quoting *Travellers Int'l, A.G. v. Trans World Airlines, Inc.*, 41 F.3d 1570, 1577 (2d Cir. 1994))). In fact, by their own words, Plaintiff alleges actual damages totaling $2,165,445 based on Defendants' alleged breach of contract. (Pl.'s Mot. Summ. J. at 22 ("It is beyond question that upon determination of a breach by [D]efendants, Silverwing is entitled to actual damages of $2,165,[5]45, the amount they paid to [D]efendants.").) This, alone, suggests that Plaintiff's claim for fraud is duplicative of their breach-of-contract claim. *See 6340 NB LLC v. Cap. One N.A.*, No. 2:20-CV-02500-OEM-JMW, 2024 WL 4100184, at *9 (E.D.N.Y. Sept. 5, 2024) ("Where damages arising from a fraud claim are identical to those damages resulting from a breach of contract, courts have dismissed fraud claims as duplicative of breach of contract claims" (quoting *Clement v. Farmington Cas. Co.*, No. 13-CV-1026 NSR, 2015 WL 6971565, at *7 (S.D.N.Y. Nov. 10, 2015))). That Plaintiff also alleges punitive damages is also "insufficient to support a separate fraud claim under New York law," particularly where they fail to allege that such punitive damages are sought as special damages. *See Koch Indus., Inc. v. Aktiengesellschaft*, 727 F. Supp. 2d 199, 214 n. 20 (S.D.N.Y. 2010) ("Although plaintiffs request punitive damages, which are only available on their fraud claims, they have not alleged any [special damages], proximately caused by defendants' alleged misrepresentations, for which plaintiffs could not recover under breach of contract. This demand for punitive damages is insufficient to support a separate fraud claim under New York law.").

the execution of the SPA, Defendants made false statements and provided falsified documents regarding the product's 510(k) certification.  Specifically, Plaintiff purports that Defendants:  (1) provided a falsified V-Trust Report containing numerous discrepancies, (Compl. ¶¶ 16-17; Pl.'s 56.1 Statement ¶¶ 10-18); (2) misrepresented the authenticity of the V-Trust Report, (Compl. ¶¶ 34-35); (3) provided falsified letters from Pulin that contained irregularities, including the misspelling of Pulin as "Pulon" in the letterhead and company logo, and attested that the products originated from Pulin's factory, (*id.* ¶¶ 19, 29-31, 34-35); (4) misrepresented that Pulon was the same as Pulin and had 510(k) certification, (*id.* ¶¶ 20, 34); (5) provided falsified bills of lading, (*see id.* ¶ 25); and (6) provided an altered UL Report, (*id.* ¶¶ 27, 32).  Plaintiff argues that the falsified documents, along with Defendants' false statements, constituted post-agreement, fraudulent misrepresentations.  (*See* Pl.'s Mem. L. Supp. at 19-21; Pl.'s Opp'n at 13-23.) Additionally, Plaintiff contends that, because these misrepresentations concealed Defendants' failure to provide products according to specification and induced Plaintiff's continued performance, its fraud claim is not duplicative.  (*See* Pl.'s Opp'n at 16-17.)  To the extent that Plaintiff argues that these purportedly fraudulent misrepresentations are collateral and extraneous to the contract, the Court disagrees.

Generally, a fraudulent representation is considered "collateral or extraneous" to a contract when it "consist[s] of independent false representations, made before there ever was a contract between the parties, which [induces Plaintiff] to enter into it." *Triangle Underwriters, Inc. v. Honeywell, Inc.*, 604 F.2d 737, 747 (2d Cir. 1979).  A misrepresentation of present facts that induce a plaintiff to enter a contract may also give rise to a non-duplicative fraud claim.  *See 246 Sears Road Realty Corp. v. Exxon Mobil Corp.*, No. 09–CV–889, 2012 WL 4174862, at *16 (E.D.N.Y. Sept. 18, 2012) ("[P]resent facts that induced the plaintiff to enter into a contract . . .

14

give rise to a non-duplicative fraud claim."); *see*, *e.g.*, *CapLOC, LLC v. McCord*, No. 17-CV-5788, 2020 WL 1036044, at *14 (S.D.N.Y. Mar. 3, 2020) ("A plaintiff may ... bring parallel fraud and breach of contract claims when there are '[m]isrepresentations of present facts made post-contract formation [that] are collateral or extraneous to the contract.'" (quoting *Minnie Rose LLC v. Yu*, 169 F. Supp. 3d 504, 520 (S.D.N.Y. 2016))).  However, fatal to Plaintiff's argument is the time at which the alleged fraudulent representations were made.  Here, Plaintiff alleges that, after the parties entered the contract, Defendants failed to provide them with authentic documentation attesting to the product's 510(k) certification and made false representations as to the legitimacy of the provided documentation.  (*See* Compl. ¶ 16-32, 34.)  Plainly, Defendants did not make a single representation prior to the execution of the SPA.  It is axiomatic that, for a fraudulent representation to be "collateral" or "extraneous," it must have been made prior to a contract.  Because these fraudulent representations are alleged to have been made post-contract, Plaintiff cannot demonstrate that their fraud claim is collateral or extraneous to the contract and, thus, not duplicative of their breach of contract claim.  *See Triangle Underwriters, Inc.*, 604 F.2d at 747.

Consequently, there can be no mistaking that Plainitff's fraud claim is duplicative. Defendants' motion for summary judgment is granted as to the fraud claim, and Plaintiff's motion for summary judgment is denied as to the fraud claim, accordingly.

## III.    UNJUST ENRICHMENT

To state a claim for unjust enrichment under New York law, a plaintiff must allege that: (1) the defendant benefitted; (2) at plaintiff's expense; and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover.  *See Beth Israel Med. Ctr. v. Horizon Blue Cross and Blue Shield of N.J., Inc.,* 448 F.3d 573, 586 (2d

Cir.2006) ("To prevail on a claim for unjust enrichment in New York, a plaintiff must establish (1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution." (internal quotation marks omitted)); *McAnaney v. Astoria Fin. Corp.*, 665 F. Supp. 2d 132, 175 (E.D.N.Y. 2009) (same).  That said, "[t]he existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery [for unjust enrichment] for events arising out of the same subject matter." *Am. Med. Assoc. v. United Healthcare Corp.*, 2007 WL 683974, at *9 (S.D.N.Y. March 5, 2007) (quoting *U.S. East Telecomms., Inc. v. U.S. West Commc'ns Servs., Inc.*, 38 F.3d 1289, 1296 (2d Cir.1994) (citation omitted)); *Clark–Fitzpatrick, Inc. v. Long Island R. Co.,* 70 N.Y.2d 382, 388 (Ct.App.1987); *see also Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of New Jersey, Inc.*, 448 F.3d 573, 587 (2d Cir. 2006) ("The existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract [like unjust enrichment] for events arising out of the same subject matter.").  Here, Defendants argue that Silvering's unjust enrichment claim should be dismissed on summary judgment because an agreement exists between the parties and Plaintiff's unjust enrichment claim is duplicative of the breach claim.  (Defs.' Mem. L. Supp. at 12.)  The Court agrees.

No valid dispute exists as to whether there was an enforceable agreement between the parties.  (Defs.' Resp. 56.1 Statement ¶ 1; SPA § 1.)  Accordingly, the unjust enrichment claim must be dismissed.  *See Res. Mine, Inc*, 2018 WL 11510914, at *10 (dismissing a plaintiff's unjust enrichment claim where an agreement existed between the plaintiff and defendant, and the unjust enrichment claim was based on the same conduct as that giving rise to the plaintiff's breach of contract claim).[6]

---

[6] Plaintiff fails to even address the existence of a contract, which, as noted, is fatal to his claim.  (Pl.'s Opp'n.)  This, alone, warrants granting Defendants' motion for summary judgment as to the Plaintiff's unjust enrichment claim.

**CONCLUSION**

For the foregoing reasons, Plaintiff's motion for summary judgment is GRANTED, in part, and DENIED, in part, and Defendant's motion for summary judgment is GRANTED, in part, and DENIED, in part.

SO ORDERED.

Dated: Brooklyn, New York          /s/ LDH
      November 25, 2025          LaSHANN DeARCY HALL
                             United States District Judge

---

*See Taylor v. City of New York*, 269 F.Supp.2d 68, 75 (E.D.N.Y.2003) ("Federal Courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way"); *see also Douglas v. Victor Capital Group*, 21 F.Supp.2d 379, 393 (S.D.N.Y.1998) (holding where the defendant's summary judgment motion addresses specific claims, and the plaintiff's opposition papers do not oppose such arguments, court may deem the claims abandoned and grant summary judgment) (collecting cases).